OPINION
Defendant-appellant, Felix Michael Carbon, appeals a decision of the Mahoning County Court of Common Pleas, Division of Domestic Relations, in a divorce action instituted by plaintiff-appellee, Kathleen Sue Carbon. Specifically, he appeals the amount of spousal support awarded to appellee and the manner of division of his pension benefits.
Appellee and appellant were married on July 7, 1970, in Youngstown, Ohio. A parent-child relationship exists between each party and three children, all of whom are emancipated without disability. The trial court agreed with both parties that they are incompatible and thus granted a divorce.
The trial court determined that spousal support was appropriate and reasonable and ordered that:
 "[appellant pay] spousal support to [appellee] in the amount of [$2,100.00] per month, beginning in October 1, 1998, and continuing until [appellee] or [appellant] dies, [appellee] remarries or cohabitates with an unrelated male, or further Order of the Court. The Court retains jurisdiction to modify the amount or term of this spousal support upon the change of circumstances of a party, which includes but is not limited to, any increase or involuntary decrease in the parties' wages, salary, bonuses, living expenses or medical expenses in accordance to R.C. 3105.18(E)(1), (F)." (Op. at 18-19)
The court stated that the spousal support shall be taxable income to appellee and tax-deductible to appellant.
The court also determined that appellant's pension should be divided by a Qualified Domestic Relations Order (QDRO), and that the trial court should retain jurisdiction over the QDRO. The order should include:
 "a. A coverture formula (years of participation in plan during the marriage divided by participant's total years of participation in the plan at retirement.) The parties shall use the dates set forth by the Court for `during the marriage'.
 "b. Joint and Survivor provision if participant dies before commencement of benefits.
 "c. Reversion of alternate payee's benefits should alternate payee die before alternate payee's benefit is received.
"d. Each party's responsibility to pay taxes.
 "e. Post retirement plan COLA, CPI, increases for alternate payee.
 "f. The alternate payee's right to receive a pro-rata share of the participant's early retirement subsidy.
 "g. The alternate payee's right to receive her share of the benefits actuarially adjusted to reflect the alternate payee's life expectancy." (Op. at 17)
Appellant's first assignment of error states:
 "THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING APPELLEE SPOUSAL SUPPORT OF $25,200.00 PER YEAR UNDER THE WEIGHT OF EVIDENCE SUBMITTED"
When reviewing a trial court's decision in domestic relations matters, an appellate court must uphold the decision absent an abuse of discretion. Booth v. Booth
(1989), 44 Ohio St.3d 142, 144. Abuse of discretion constitutes "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219.
R.C. 3105.18(C)(1) provides:
 "In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
 "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
"(b) The relative earning abilities of the parties;
 "(c) The ages and the physical, mental, and emotional conditions of the parties;
"(d) The retirement benefits of the parties;
"(e) The duration of the marriage;
 "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
 "(g) The standard of living of the parties established during the marriage;
 "(h) The relative extent of education of the parties;
 "(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
 "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 "(l) The tax consequences, for each party, of an award of spousal support;
 "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 "(n) Any other factor that the court expressly finds to be relevant and equitable."
Appellant acknowledges that since the time of the Kunklev. Kunkle (1990), 51 Ohio St.3d 54, decision, R.C. 3105.18
(C)(1) was amended to read, "in determining whether alimony is appropriate and reasonable," rather than "in determining whether alimony is necessary." Yet, appellant maintains that spousal support is still based in part on need and quotesKunkle to support this: "When a sustenance award is not limited to the payee's need, the award has the effect of punishing the payor and rewarding the payee." Appellant believes that the concept of need is implicit in R.C.3105.18(C)(1)(a), (b), (d), (f), (h), and (i), and that need is also one of the additional factors a court can consider as "relevant and equitable" under R.C. 3105.18(C)(1)(n).
Appellant finds that this analysis is consistent with this court's decision in Olenik v. Olenik (Sept. 18, 1998), Mahoning App. No. 94 CA 139, unreported, 1998 WL 668162, because the Olenik
court still considered need as a factor, although not the sole consideration in arriving at the amount of spousal support to be awarded. To reconcile the ideas of need and "reasonable and appropriate," appellant proposes, without any case support, that the more an alimony award exceeds the stated need, the less chance of it being reasonable and appropriate.
In reference to the factors of R.C. 3105.18(C)(1), appellant acknowledges the disparity in income between appellee and himself. Yet, he also notes that the parties did not have an extravagant standard of living during the marriage; their age, physical, mental and emotional condition were comparable; neither appellant nor appellee obtained a college degree; and appellee would not have attended college regardless of whether she married appellant, and thus there is no indication that her earning capacity would have differed had she not married appellant. Moreover, while this case was pending, appellant was paying appellee $1,489.80 per month in temporary spousal support with which appellee made payments towards the first and second mortgages, residential utilities, food, cable television, medical expenses not covered by insurance, newspaper, toiletries, clothing, and recreation.
Appellant believes that appellee was able to meet all of her needs and even baby-sat and worked at her son's bar without pay, showing no need for paid employment. Appellant finds that appellee's costs per month are $771.00 plus housing, and even if housing would cost $450.00 per month, her post-divorce need would not exceed $1,221.00 per month. With the spousal support awarded, she will be receiving 170% of this amount. Also, accounting for the $13,200.00 per year that she is able to earn, the spousal support awarded is 350% of her monthly need. Thus, appellant concludes, "an award of 170% (350% with imputing income) of the stated need cannot be deemed to be appropriate and reasonable under all of the circumstances of this case."
This court has stated:
 "As a review of [R.C. 3105.18(C)(1)] reveals, an award of spousal support is no longer predicated on the idea of need. R.C. 3105.18, as amended January 1, 1991, directs courts to consider the appropriateness and reasonableness of spousal support rather than whether it is a necessity. This court previously addressed the statutory amendment in Tomovcik v. Tomovcik (Jan. 22, 1997), Jefferson App. No. 95 JE 22, unreported, p. 3, recognizing the shift in the statute's focus. The Tenth Appellate District likewise recognized the 3105.18(C) in Schultz v. Schultz (1996), 110 Ohio App.3d 715, 724, 675 N.E.2d 55:
 "`When considering an award of spousal support, a court should consider all fourteen factors listed in R.C. 3105.18(C), and award only an amount which is appropriate and reasonable, not an amount based upon need.'" Olenik, 1998 WL 668162 at *3
An award is reasonable if it is "fair, proper, just, moderate, suitable under the circumstances, [and][f]it and appropriate to the end in view." Black's Law Dictionary (6 Ed.Rev. 1990) 1265. An award may be in excess of the stated need, yet it may still be viewed as reasonable and appropriate. Olenik, 1998 WL 668162 at *3. When a trial court's decisions are required to be reasonable, we are guided by the presumption that the lower court's findings are correct. Focke v. Focke (1992), 83 Ohio App.3d 552, 555.
Despite appellant's noted acknowledgment of the shift in the focus of R.C. 3105.18(C)(1), he still incorrectly emphasizes that the spousal support awarded exceeds necessity, without referring to the established statutory framework to show why the spousal support awarded is not appropriate or reasonable. Moreover, even if some of appellant's arguments were intended to refer to R.C.3105.18(C)(1), merely showing that a few of the statute's factors do not favor the spousal support award, without considering the other factors that do, cannot imply that the spousal support award is not appropriate or reasonable.
Contrarily, the trial court's order of spousal support in the amount of $1,200 per month was based on a careful consideration of the relevant factors listed in R.C. 3105.18(C)(1). In reference to the statutory factors, the court made several findings based on the evidence, such as the substantially greater income and earning ability of appellant as opposed to appellee, the agreement between the parties that appellee would serve as homemaker during the marriage, the twenty-eight-year duration of the marriage, and the comfortable standard of living enjoyed by the parties during the marriage.
Thus, after carefully considering the evidence in the context of the relevant factors of R.C. 3105.18(C)(1), even if the trial court found that the amount of spousal support awarded exceeded that which was necessary, it found that it was reasonable and appropriate pursuant to R.C. 3105.18(C)(1), and that it was not so disproportionate to appellee's expenses as to be viewed otherwise. As such, the trial court's decision was not "unreasonable, arbitrary, or unconscionable," and thus the trial court did not abuse its discretion.
Accordingly, appellant's first assignment of error is without merit.
Appellant's second assignment of error states:
 "THE TRIAL COURT ABUSED ITS DISCRETION IN ISSUING A QUALIFIED DOMESTIC RELATIONS ORDER (QDRO) AS TO THE PENSION PLAN AND IN NOT EQUITABLY DIVIDING THE PENSION PLAN BASED UPON A PRESENT VALUE OF $56,745.69."
David I. Kelly of Kelly, Shulman and Company, an expert in pension evaluation, testified extensively about how to divide appellant's pension benefits. Appellant is a member of General Motors Salaried Retirement Program, and his employment began on November 1, 1970. Kelly evaluated the pension as of January 30, 1998, when the accrued annual pension was $14,459.52. The marital portion of the plan was 27.24 years, the duration of the marriage at the time. The plan retirement age is sixty-five years.
Kelly provided two calculations, detailed in his Horizon Pension Report, which he used to arrive at an appropriate division of appellant's pension benefits. First, he performed an accrual present value calculation. This is the traditional present value calculation, and it refers to the benefit accrued during the marriage. The present value of the pension benefits at the date of the divorce trial was $56,745.69. This calculation assumes that the plan participant ceases work on the date of the valuation of the pension and that he retires at the plan retirement age. In this case, appellant testified that he continued to be employed by General Motors and he did not think that he would retire early.
Kelly's second calculation was a service pension calculation. This method takes into consideration the effect of the "thirty and out" benefit, which appellant can receive if he retires in February 2001. Kelly testified that the present value of the service pension was $243,182.87. Kelly then employed the Kelly Shulman Scale percentage, which depicts "how much a current lump sum offset distribution would have to earn on a yearly compounded basis to equal the value of the `service' or `matured full vested' pension." (Plaintiff's Exhibit 7, p. 135). In this case, appellee would have to earn 70.4% interest per year for the next three years on the accrued present value amount of $56,746.00 in order to equal the value of the service pension. Kelly made the following assumptions in calculating the service pension alternative:
 "(1)He assumed that appellant would continue with the plan and in his employment with General Motors until he is eligible for the `thirty and out' provision.
 "(2) He assumed that General Motors would provide salaried employees all benefits given to union employees through the collective bargaining agreement.
 "(3) He assumed that appellant would retire at age fifty-two, as soon as he was eligible for the thirty and out provision." (Op. at 7)
Appellant argues that the trial court abused its discretion in not dividing the parties' assets according to the present value of the pension plan, which was $56,745.69. Because appellant is an at-will employee for General Motors, working on a month-to-month basis, appellant believes that it was speculative to assume that he would work until retirement age or until eligible for the 30-and-out provision of the pension plan. Appellant also notes that in 1996 when Kelly prepared an evaluation of appellant's pension, prior to the Horizon Pension Report that he prepared in 1998, Kelly had recommended distribution of the pension using a traditional evaluation and not a QDRO. Also, Kelly testified that if appellant does not work long enough to become vested in the 30-and-out provision, or if he worked beyond when he would be eligible for the 30-and-out provision, until he was 65, it would be more favorable to appellee if she received an equitable share of the present value of $56,745.69. Furthermore, appellant cites to Hoyt v. Hoyt, 53 Ohio St.3d 177, where the court stated that a trial court should attempt to disentangle the parties' economic partnership to create finality of their marriage, best accomplished by granting the non-participant the present value of the pension plan.
When considering a fair and equitable distribution of pension benefits in a divorce, the trial court must apply its discretion based upon the circumstances of the case, the status of the parties, the nature, terms and conditions of the pension plan, and the reasonableness of the result. Hoyt, 53 Ohio St.3d at 179. The trial court should attempt to preserve the pension in order that each party can procure the most benefit, and should attempt to disentangle the parties' economic partnership so as to create a conclusion and finality to their marriage. Id. at 179. While appellant presented finality as an advantage of determining a present cash value of the pension, he failed to mention a corresponding disadvantage of this approach also discussed by theHoyt court. Determining a present cash value presents the difficulty in projecting, deducing, and calculating what a future benefit is worth in terms of today's dollar. Id. at 182.
When the present value is used to value a pension, it provides only a snapshot of the pension's value at a given moment. The present value alternative may be viable only when the parties have other substantial marital assets to offset the nonemployed spouse's share. Hoyt, 53 Ohio St.3d at 182. Disentangling the affairs of the parties is important but not the only factor to consider. Haynes v. Haynes (Mar. 4, 1998), Summit App. No. 18487, unreported, 1998 WL 114424 at *1. Where circumstances permit, the trial court should attempt to ascertain the optimum value the pension has to the parties as a couple and structure a division which will procure the most benefit to each party, based upon the nature and terms of the plan. Hoyt, 53 Ohio St.3d at 183.
As opposed to offsetting assets based on present value, a QDRO "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan * * *." Employee Retirement Income Security Act of 1974, Section 206(d)(3)(B)(i)(I). The QDRO entitles the nonparticipant to an equal share of the marital portion of the pension at the time of its actual distribution upon the participant's retirement. Haynes, 1998 WL 114424 at *1. Choosing a deferred distribution via a QDRO instead of offsetting assets may prevent an inequitable result. According to the Second District Court of Appeals in Layne v. Layne (1992), 83 Ohio App.3d 559,567:
 "[A] retirement plan is an investment made by both spouses during marriage to provide for their later years. They anticipate that the value of the investment will increase with time. At divorce, each spouse is entitled to the value of his or her investment. When the investment has not yet matured, each is entitled to its value at maturity in proportion to the years of the marriage. * * * [T]he nonemployed former spouse is entitled to the benefit of any increase in the value of his or her unmatured proportionate share after divorce attributable to the continued participation of the other spouse in the retirement plan. That increase was contemplated when the investment was made. It would be inequitable to deprive the owner of its value. * * *"
In Haynes, the Ninth District Court of Appeals considered a pension plan that also involved a 30-and-out provision. The court noted that the parties involved were married for over twenty-five years and that the nonparticipant's marital share of the participant's pension was substantial. Haynes, 1998 WL 114424 at *2. There was no way for the trial court to predict the value of this pension at the time of the participant's retirement. Id. The Ninth District deferred to the trial court's conclusion that, due to the 30-and-out provision, the value of the pension was likely to increase dramatically in the future, and that equal division by QDRO preserved the greatest benefit to each party. Id. The trial court had noted that the case displayed a "striking example of the dramatic increase which can occur in the value of a pension, if the participant continues working for some additional period of time," and that "[g]ranting Wife offsetting assets based on the present value of Husband's pension in this case would inequitably deprive Wife of the growth on the marital share of the pension." Id. at *1-*2.
The trial court in this case employed analysis very similar to the trial court in Haynes. Noting the service pension evaluation of $243,182.87, the trial court stated that this case offered a "striking example of the dramatic increase, which can occur in the value of a pension, if the participant continues working for an additional period of time." The court found that a division based on the accrual method would inequitably deprive appellee of her marital share of the pension. Because a trial court should attempt to procure the most benefit for each party, the court found that the pension should be valued pursuant to the service pension alternative and distributed by a QDRO.
Regarding valuation of the pension, appellant either incorrectly interprets or chooses to ignore Kelly's findings in his Horizon Pension Report, when appellant stated that the present value of the pension plan at the time of trial was $56,745.00. Kelly actually determines two present values based upon appellant's pension plan, as detailed supra. The present value of the accrued pension was $56,745.69, whereas present value of theservice pension earned during marriage was $243,182.87. While Kelly agrees with appellant to some extent that findings based on the 30-and-out provision are speculative, he explains that the accrued benefit method may be myopic in describing the possible benefits under the plan. Then, in providing the third step of evaluating the pension, the Kelly Shulman Scale percentage, Kelly states:
 "The richness of the supplemented `30-and-out' benefit does not necessitate any further analysis for most. Clearly, the nonparticipant spouse would benefit from maintaining their ownership share of the pension with a properly drafted QDRO. However, the Scale reveals exactly how lucrative the QDRO choice is for the nonparticipant. The nonparticipant spouse would have to earn a staggering 70.4% a year for the next 3 years on their half of the $56,746 present value to generate the money to fund the equivalent of their share of the `30-and-out' benefit." (Plaintiff's Exhibit 8)
Kelly explains:
 "when double-digit rates of return must be realized in less than 10 years, the nonparticipant should seriously consider opting for a coverture QDRO or at least attempt to negotiate a higher present value than that offered under the deferred vested pension." (Plaintiff's Exhibit 7, p. 140)
Although appellant seems to imply that Kelly changed his testimony from his 1996 to his 1998 reports from suggesting a present value evaluation of the accrued benefit to suggesting distribution by QDRO this assertion is countered by Kelly's testimony. Kelly stated that his reason for failing to provide a service pension evaluation in 1996 wasnot because he felt it was speculative (although his actual reason is not provided in the record), and that he still mentioned the 30-and-out provision in the 1996 report as a warning.
Procuring the most benefit to each party was clearly the intent of the trial court when it ordered an equal division by QDRO. Based on Kelly's analysis of appellant's pension plan and situation, as well as current case law justifying the employment of QDROs, the trial court's decision was not "unreasonable, arbitrary or unconscionable." Thus, the trial court did not abuse its discretion in the distribution of appellant's pension benefits.
Accordingly, appellant's second assignment of error is without merit.